## CIRCUIT COURT OF FAIRFAX COUNTY

Ceres Assoc. Sales
and Mktg., Inc.

v.

Veridian Corp.

October 16, 2003

Case No. (Law) 208217

BY JUDGE ARTHUR B. VIEREGG

This letter opinion is written to supplement my ruling striking the evidence of plaintiff Ceres Associates Sales and Marketing, Incorporated ("Ceres") at the conclusion of Ceres' case-in-chief in the July 22, 2003, trial of the captioned case. I granted the defendant Veridian's motion to strike based on the argument that Ceres' evidence demonstrated that a partnership, Iris Perry & Associates, Inc. ("IPA"), not Ceres, was the party to the contract sued upon and accordingly Ceres did not have standing to prosecute this contract action. Veridian, however, had moved to strike Ceres' evidence on other grounds. While I denied the motion to strike on several of those grounds, I did agree to take under advisement and furnish the parties a letter opinion as to the issue of whether or not Ceres' evidence proved damages. Both Counsel requested me to do so. My decision as to that ground of Veridian's motion follows.

### The Plaintiff's Evidence

The material facts proven by Ceres as part of its case-in-chief are the following. Iris Perry and Shelly Bond formerly worked for the federal government in the area of federal procurement. Upon leaving government

service in or about in 1992 or 1993, they organized a *de facto* partnership, Iris Perry & Associates ("IPA"). The company was in the business of identifying clients who might be eligible to gain minority preferences in contracting with the federal government. Because federal regulations had been promulgated that would limit the amounts of non-competitively bid minority contracts, Perry and Bond actively sought to market their services to prospective government minority contractors before the limitation became effective. They would seek to identify federal government needs which might be met by its minority government contracting clients.

The General Services Agency, moreover, had begun a new program pursuant to which government contractors might provide products and services to the federal government. The agency would, for a fee, assign those services and products to other federal government agencies, thus operating as "a virtual store." This program was referred to as the Federal Systems Integration Management program and was known by the acronym, FedSim.

On August 1, 1995, Signal Corporation, the predecessor of Veridian, negotiated a Consultant Agreement with IPA pursuant to which IPA would seek to assist Signal in securing the award of FedSim contracts and would act as a liaison with Signal's clients. Pl. Ex. 29. The Consultant Agreement provided for a six month term after which it might be terminated by either party. The Agreement provided that Signal would pay IPA $5,000 per month plus other consideration set forth in a memoranda of understanding ("MOUs") to be prepared with regard to "business opportunities" identified and pursued by IPA. Such a form MOU was attached and provided that IPA would be paid 5% of the amount of each "task order" acquired by Signal from FedSim. Thus, this Agreement required IPA to furnish marketing and liaison services for $5,000 a month and 5% of the amount each task order awarded by FedSim to Signal.

In late 1995, Signal was scheduled to meet with FedSim regarding possible contracts it might be awarded. Before that meeting, Signal and IPA representatives met. Signal asked IPA to enter into a teaming agreement. The parties entered into the new agreement dated November 22, 1995 ("Teaming Agreement"). Pl. Ex. 31. Instead of the terms in the former MOU, the Teaming Agreement provided that, if Signal were awarded a prime contract, IPA would be awarded a contract and would receive compensation "equal in value to five percent (5%) of the total profit bearing revenues received by Signal." It provided that the Teaming Agreement would remain in effect until (1) either party opted not to continue the relationship after thirty days notice to the other party; (2) an official government announcement that the FedSim program had been terminated; (3) an award of a request for proposal from

another prime contract; (4) the award of a prime contract to Signal and award of a subcontract to IPA; (5) inability of Signal and IPA to negotiate a subcontract after the award of a prime contract to Signal; (6) the passage of one year; or (7) either parties' insolvency or bankruptcy. While the Consultant Agreement would have compensated IPA for each task order awarded to and performed by Signal, the Teaming Agreement anticipated a new *subcontract* pursuant to which IPA would provide additional services for which it would be paid.

In January 1996, the Department of the Army awarded a FedSim contract to Signal in the amount of $92,997,512. Meanwhile, on January 30, 1997, Ceres was formed and incorporated as a Maryland corporation. On February 1, 1997, IPA assigned all of its assets to Ceres but retained the rights to use "IPA" as a trade name.

Thereafter, in March 1997, IPA and Signal entered into the Professional Services Consultant Agreement ("Second Consultant Agreement") pursuant to which IPA was to provide services and receive the compensation of an amount equal to that provided for in the Teaming Agreement. Pl. Ex. 1. The Second Consultant Agreement was dated February 1, 1997.

The Second Consultant Agreement provided both that it superceded all prior agreements between the parties and further that IPA was to perform tasks described in Attachment 1 to it.[1] The "Work Description" in Attachment 1 enunciated various marketing and liaison duties related to procuring and performing federal contracts similar to those that IPA had been performing for Signal pursuant to the parties' earlier agreements. However, the Second Consulting Agreement also provided that IPA would "provide other support to Signal customers such as engineering, information technology, and administrative services." The Work Description in Attachment 1 also specified that: "as tasked by Signal, IPA shall provide technical, management, and administrative services in support of work performed under Signal Prime Contract No. DABT963-96-D-0006." Pl. Ex. 1. Nevertheless, paragraph 6 of the Second Consultant Agreement stated: "Consultant reserves the right to accept or reject any Signal assignment." Pl. Ex. 1.

In the ensuing months, difficulties arose. On December 30, 1997, Signal directed IPA to submit a purchase order for requested work and later directed IPA to hire employees to assist Signal in performing the prime contract. Pl. Ex. 33. IPA, however, refused to hire and provide such personnel. They

---

[1] Paragraph 16 of the Second Agreement provided: "this Agreement, together with all attachments hereto, contains the entire agreement between the parties respecting the subject matter hereof and supersedes and cancels all previous negotiations, agreements, representations, commitments, and writings in respect thereto." Pl. Ex. 1.

maintained that the compensation payable under the Second Consulting Agreement was simply a commission owed for their assistance in Signal's obtaining of the prime contract with the Department of the Army. IPA refused to perform any task orders requiring IPA to provide technical services. Pl. Ex. 37. By letter of February 2, 1998, Signal treated this refusal as a repudiation of IPA's duties under the Consultant Agreement. Pl. Ex. 2.

## Decision

In considering a motion to strike a party's evidence, a court "must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the non-moving party. Any reasonable doubt about the sufficiency of the evidence must be resolved in favor of the non-moving party." *Balzer & Associates v. Lakes on 360, Inc.*, 250 Va. 527, 531-32, 463 S.E.2d 453 (1995). Thus, this court must examine the evidence and inferences related to the remaining damages issue in the light most favorable to the Plaintiff, Ceres.

Ceres' cause of action against Veridian is based on Signal's wrongful termination of the Second Consultant Agreement. Ceres contends that, on account of that breach, it is entitled to recover damages equal to five percent of the Department of Army FedSim contract, the revenues that Ceres potentially might have received had the Agreement not been prematurely ended.

Although not argued, Ceres probably could not prove it would necessarily have received those revenues. The Second Consultant Agreement only created the possibility that Ceres could earn 5% of the Army prime contract by performing task orders. Ceres, moreover, retained the option to refuse performance of such task orders. Since the scope of its services could not be known, Ceres, therefore, could not quantify the revenue it would receive of the cost of that performance.

In evaluating Veridian's motion, it must first be recognized that a plaintiff such as Ceres is not required to prove damages with "mathematical certainty." *Estate of A. T. Taylor v. Flair Property Associates*, 248 Va. 410, 414, 448 S.E.2d 413 (1994). However, the amount of damages suffered must be demonstrated with reasonable certainty, and damages that are speculative or uncertain are not recoverable. *E. I. Dupont DeNemours & Co. v. Universal Moulded Products Corp.*, 191 Va. 525, 573, 62 S.E.2d 233 (1950). A plaintiff must therefore provide evidence sufficient to enable the trier of fact to render an "intelligent and probable estimate of the damages sustained." *Estate of A. T. Taylor*, 248 Va. at 414.

In support of its motion to strike, however, Veridian urges that Ceres failed to prove its true damages eventuating from Signal's supposed wrongful contract termination. Veridian urges that the measure of Ceres' damages are, as a matter of law, not the revenues Ceres failed to earn, but rather the profits Ceres failed to realize as a consequence of that termination. In other words, Veridian contends that the measure of Ceres' damages was the amount of revenues Ceres would have received had the Agreement been performed *less* the cost of its performance. Veridian relies on two Virginia cases in support of its damages evidence argument, *Matthews v. La Prade*, 144 Va. 795, 130 S.E. 788 (1925), and *Adams, Payne & Gleaves, Inc. v. Indiana Wood Preserving*, 155 Va. 18, 154 S.E. 558 (1930).

In *Adams, Payne & Gleaves*, the Supreme Court of Virginia determined, *inter alia*, that the necessary showing of damages had not been satisfied by Indiana Wood. *Id.* at 30. Indiana Wood, as here, had only introduced evidence of lost revenues from the work pursuant to the wrongfully terminated contract but (with one exception) had not proven its cost of performance and therefore its damages. The Court stated, "in order for [Indiana Wood] to recover, it was incumbent upon it to prove with reasonable certainty not only the gross amount it was to receive under the contract, but the cost of performing the work, such as the cost of fuel, labor, overhead expenses, and the like." *Id; see also* Restatement (Second) of Contracts § 347 (1981).

Section 347 of the Restatement (Second) of Contracts provides:

Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) of Contracts § 347 (1981) (emphasis added).

Ceres does not argue otherwise. Because Ceres failed to prove its cost to perform the Second Consultant Agreement, its claimed damages are speculative and therefore unrecoverable. *See Adams, Payne & Gleaves*, 155 Va. at 30.

Ceres' explanation for not presenting evidence as to the cost of performance was explained in argument. Ceres' counsel, Mr. Tolchin, asserted that the payment of the 5% commissions constituted past consideration for the

marketing services provided pursuant to the 1995 Consultant Agreement and the Teaming Agreement.

> What they did and what happened here is that they said, Signal said, we are going to reward you with a very lucrative Professional Services Consultant Agreement, and that is what this is, a very lucrative Professional Services Consultant Agreement. What it says is we are going to pay you five percent of the revenue from the FedSim contract. Why? Because you earned it. It is yours. You are the one who made us get this contract.

Transcript 405:11-18. In other words, Ceres was not expected to perform any services for the revenues payable pursuant to the Second Consultant Agreement. Ceres' evidence belied this position. Ms. Parry testified that Ceres was bound to provide its traditional marketing and liaison services, although not technical services. This admission made plain that Ceres was obligated to provide some services, although it contended it was not obligated to perform services the Agreement expressly indicated it was obligated to perform.

Ceres' argument fails for at least three reasons. First, Ceres sued for a breach of the Second Consultant Agreement, not for a breach of the parties' earlier agreements. Second, the Second Consultant Agreement makes plain that it superceded all prior agreements between the parties, and it plainly obligated Ceres to provide certain specified services. Of course, Ceres was granted the option to refuse some services, a right it arguably exercised in refusing to perform technical services. However, the Second Consultant Agreement plainly required Ceres to provide future services of a specific kind to gain its compensation equivalent to 5% of the total profit bearing revenue services received by Signal pursuant to the Army prime contract. Ceres is precluded by the parol evidence rule from presenting evidence to alter the plain meaning of its written agreement. *See Godwin v. Kerns*, 178 Va. 447, 451, 17 S.E.2d 410 (1941) ("In controversies between two parties to a contract, parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument."). Moreover, the parol evidence rule is not a rule of evidence subject to waiver; it is a matter of substantive law. *Zehler v. E. L. Bruce Co.*, 208 Va. 796, 797, 160 S.E.2d 786 (1968). Third and finally, it is a fundamental principle of contract law that "when ... a service has been rendered before a promise was made, the prior service is not a sufficient consideration to support the promise." *Sager v. Basham*, 241 Va. 227, 230, 401 S.E.2d 676 (1991) (citing *Davis v. Anderson*,

99 Va. 620, 39 S.E. 588 (1901)). Rather as a whole, Ceres' evidence establishes a novation pursuant to which the parties agreed that their prior agreements would be replaced by their rights and obligations contained in the Second Consultant Agreement. *See Dere v. Montgomery Ward & Co.*, 224, Va. 277, 280, 295 S.E.2d 794 (1982) *(citing Honeywell, Inc. v. Elliott*, 213 Va. 86, 89, 189 S.E.2d 331 (1972)) ("A novation may be effected by two parties; an existing obligation is discharged when a creditor and his debtor agree to substitute a new obligation running from the debtor to his creditor.").

For the above reasons, I conclude that Veridian's motion to strike on account of Ceres' failure to prove its damages must be granted.